UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE UNITED STATES OF AMERICA | * |
| | * |
| v. | * |
| | *   Criminal No. 16-30034-MGM |
| CHRISTOPHER CABALLERO (1), | * |
| NATHAN CABALLERO (2), | * |
| RAYMOND CARRASQUILLO (3), | * |
| SEAN KRASIN (5), | * |
| | * |
| Defendants. | * |

MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTIONS TO DISMISS
AND MOTIONS TO SUPPRESS
(Dkt. Nos. 146, 147, 148, 150, 151, 156, 157, 158, 159)

December 20, 2017

MASTROIANNI, U.S.D.J.

## I. INTRODUCTION

Since early 2016, the Federal Bureau of Investigation's ("FBI") Western Massachusetts Gang Task Force ("GTF") investigated a particular ring of heroin trafficking in Holyoke, MA.[1] As part of that investigation, cooperating witnesses made more than ten controlled purchases from each Christopher Caballero, Nathan Caballero, Sean Krasin, and Louis Roman Soler (collectively, with

---

[1] The facts recited here are uncontroverted and drawn from the parties' briefs and documents referenced therein for purposes of the motions ruled on here.

Raymond Carrasquillo, the "Defendants"), between March and May of 2016. The quantity purchased ranged from "half packs" (150 bags) to "10 packs" (1000 bags). Partially on that basis, this court authorized electronic surveillance of cellular phones used by Defendants Krasin, Soler, and Christopher Caballero. Based on intercepted communications, the investigation led the government to believe that Nathan and Christopher Caballero sold heroin in their residence at 53 Samosett Street in Holyoke, MA.

Ultimately, communications surveilled on July 25, 2017, suggested Christopher Caballero and Carrasquillo would effect a particularly large deal by the end of that day. Through text messages or voice calls, Caballero asked to purchase "100 packs" (10,000 bags) of heroin, causing the government to believe Carrasquillo represented a main supplier, a then unknown target of the investigation. Although timing appears to be in dispute,[2] by no later than 7:40 p.m. agents learned the exchange would occur at 53 Samosett Street in Holyoke. By 8:00 p.m., physical surveillance and/or pole cameras observed Carrasquillo exit a BMW at that address and enter the residence carrying a black backpack. Moments later, law enforcement agents from the FBI GTF, the Holyoke Police Department, Massachusetts State Police, and the Bureau of Alcohol, Tobacco, and Firearms entered the residence without a warrant, performed a protective sweep[3] of the entire residence and secured everyone present. (146 ¶ 4). According to an FBI FD-302 Warrant Service Report attached to Christopher Caballero's motion to suppress, agents found a 100 packs of heroin lying in plain view between Caballero and Carrasquillo, who were seated on a living room couch, and $15,000 inside a backpack lying within Carrasquillo's reach.

---

[2] The Defendants' briefs suggest the government had notice as early as 1:50 p.m. that a large drug transaction would occur at 53 Samoset and was therefore obligated to request an anticipatory warrant much earlier in the day. *See*, *e.g.*, Dkt. No. 146 at ¶ 2. They repeated and elaborated on this theory at oral argument. The instant memorandum opinion makes no ruling on this issue.
[3] The extent, circumstances, and legality of this action are contested but need not be resolved here. As discussed at oral argument, these issues will receive an evidentiary hearing to be scheduled by separate order.

The government contends (unchallenged by the defendants) that by approximately 6:30 p.m.—before entry into the house—an FBI agent and an Assistant United States Attorney began preparing a search warrant affidavit for 53 Samosett Street and notified the magistrate of the impending warrant application. The magistrate eventually granted that application and signed a warrant at approximately 10:30 p.m. at a state trooper barracks in Northampton. In the interim, agents had arrested the Caballero brothers and Carrasquillo under 21 U.S.C. § 841 and searched their persons. Keys to an Infinity sedan parked in the yard of the residence were found on Nathan Caballero. Later, either before or after the warrant issued, agents searched the house and the Infinity sedan.[4] They recovered a variety of firearms, ammunition, drugs, and an additional $8,056.00 in safes and rooms throughout the house. In total, they seized 15,294 bags of heroin, 28.5 grams of cocaine, and a small amount of marijuana.

Just over a week later, a grand jury indicted the movant-Defendants for a violation of 21 U.S.C. § 841 (Conspiracy to Distribute and Possess Heroin). (Dkt. No. 16.) Several months later, on February 17, 2017, the grand jury issued a superseding indictment charging the Defendants with a collective 19 substantive counts for conspiracy, distribution, possession, aiding and abetting, and felon in possession charges. (Dkt. No. 116). The foreperson for the grand jury in each instance was a county Assistant District Attorney ("ADA").[5]

Defendants Carrasquillo, Krasin, Christopher Caballero, and Nathan Caballero have each moved under Rule 6 of the Federal Rules of Criminal Procedure to dismiss the indictment based on the ADA's inclusion on the grand jury and to suppress all evidence recovered at 53 Samosett Street. For the reasons and to the extent explained below, the court DENIES each Defendants' motion to dismiss, (Dkt. Nos. 147, 148, 150, 156), and DENIES Defendant Carrasquillo's motion to suppress

---

[4] The Defendants also alleged during oral argument that the agents extensively searched the house before the warrant issued. These and related factual issues will be addressed during the evidentiary hearing. *See* note 3, *supra*.
[5] No requests have been made addressing grand jury secrecy issues. *See* Fed. R. Crim. P. 6(e)(2).

(Dkt. No. 146) for lack of standing. As discussed during oral argument, the remaining motions to suppress will receive an evidentiary hearing.

## II. CARRASQUILLO'S MOTION TO SUPPRESS (DKT. NO. 146)

Carrasquillo's motion must be dismissed for lack of standing. When moving to suppress under the Fourth Amendment, a defendant "carries the burden of establishing that he had a reasonable expectation of privacy with respect to the area searched or . . . the items seized." *United States v. Lipscomb*, 539 F.3d 32, 35–36 (1st Cir. 2008) (citing *United States v. Salvucci*, 448 U.S. 83, 91-92 (1980)). An expectation of privacy is the "threshold standing requirement that a defendant must establish before a court can proceed with any Fourth Amendment analysis." *United States v. Lewis*, 40 F.3d 1325, 1333 (1st Cir.1994). To establish this,

> "a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; i.e., one that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."

*United States v. Samboy*, 433 F.3d 154, 161 (1st Cir. 2005) (quoting M*innesota v. Carter*, 525 U.S. 83, 88 (1998).

Defendant Carrasquillo has not done so here with respect to 53 Samosett Street. His counsel was forthright in conceding the point during oral argument when signaling that Carrasquillo would not seek an evidentiary hearing on the matter. His affidavit, moreover, simply states that he arrived at that location at approximately 8 p.m. and that within "a few minutes . . . numerous members of law enforcement entered the residence with their guns drawn." (Dkt. No. 146-1). Therefore, because Carrasquillo has not challenged the government's representations that he was present for purely commercial purposes and a "casual visitor for a brief period," the court concludes that he cannot establish a reasonable expectation of privacy in that residence. *United States v. Rodríguez–Lozada*, 558 F.3d 29, 37 (1st Cir.2009).

4

## III.    MOTIONS TO DISMISS (DKT. NOS. 147-48, 150, 156)

Defendants argue that dismissal is warranted because a county ADA served as the foreperson of the indicting grand jury.[6] (Dkt. Nos. 147, 150). Although Defendants' briefs attempt to posture arguments under two distinct headings and two distinct grounds for dismissal—violation of the court's jury selection plan and the alleged bias of the ADA—their motions invoke only Rule 6(b)(2) of the Federal Rules of Criminal Procedure and section 1867 of the Jury Selection and Service Act of 1968, codified at 28 U.S.C. § 1861 et seq., (the "JSSA" or "Act"). As explained below, the Court concludes Defendants have not established grounds for dismissal under Rule 6(b)(2) and the JSSA and denies their motions. As further explained below, the court denies these motions without prejudice to the extent they invoke Rule 12 or some other ground for dismissal relating to the ADA's alleged bias.

### A. Defendants have failed to establish a substantial failure to comply with the JSSA under Rule 6(b)(2).

As a threshold matter, the court determines the Defendants have thus far only moved for dismissal for violations of the JSSA, although vague assertions in their briefs invoke other grounds for dismissal related to the ADA's alleged bias. Nevertheless, because each motion is explicitly made "pursuant to Rule 6(b)(2) of the Federal Rules of Criminal Procedure and 18 U.S.C. § 1867(a)," (Dkt. Nos. 148 & 156), the merits analysis is governed by the JSSA.

Rule 6(b)(2) provides that:

> A party may move to dismiss the indictment based on an objection to the grand jury or on an individual juror's lack of legal qualification, unless the court

---

[6] Defendants Carrasquillo and Christopher Caballero filed motions to "join" Defendant Krasin's motion to Dismiss. Defendant Nathan Caballero's motion is virtually identical to Defendant Krasin's. Each motion invokes only Rule 6(b)(2) as authority for dismissal. For the sake of simplicity the court construes the motions to join as motions to dismiss identical to Krasin's and denies each for the reasons discussed herein.

5

> has previously ruled on the same objection under Rule 6(b)(1). The motion to dismiss is governed by 28 U.S.C. § 1867(e).

Section 1867(e), in turn, deems the provisions of the JSSA to be the "exclusive means by which a person accused of a Federal crime . . . may challenge any jury on the ground that such jury was not selected in conformity with the provisions of" the JSSA. Section 1867(a) further provides that dismissal is only warranted upon a showing of a "substantial failure to comply with [JSSA] provisions . . . in selecting the grand or petit jury." 28 U.S.C. § 1867(a). Thus, by the plain terms of the only authorities the Defendants have invoked, and as many courts have recognized, the present motions must establish a "substantial failure" to comply with the JSSA.[7] *See, e.g.*, *United States v. Tsarnaev*, 53 F. Supp. 3d 443, 446 (D. Mass. 2014).

A "substantial failure" to comply with the JSSA is one that threatens the right to be tried by a fair cross section of one's community and is therefore wholly unrelated to the alleged bias that animates the Defendants' arguments.

The JSSA declares:

> It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes. It is further the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States, and shall have an obligation to serve as jurors when summoned for that purpose.

28 U.S.C. § 1861. Additionally, under section 1862, no one may be excluded from jury service "on account of race, color, religion, sex, national origin or economic status." Thus, the statute's expressly

---

[7] While Defendants' motions invoke section 1867 of the JSSA, their briefs only reference the court's jury selection plan and make no mention of the Act. By asserting failures to comply with the plan, Defendants invoke the Act all the same. As explained at length below, the plan is simply an implementation of the Act's directives, and it was explicitly adopted "[p]ursuant to the Jury Selection and Service Act," which by its own terms deems the procedures set forth in section 1867 to be the "exclusive means by which a person accused of a Federal crime . . . may challenge any jury on the ground that such jury was not selected in conformity with the [Act]." 28 U.S.C § 1867(e). *See also United States v. Bearden*, 659 F.2d 590, 601 (5th Cir. 1981) (construing challenges to compliance with a local plan as challenges under the JSSA).

6

stated "purpose" is to insure that juries are "selected at random from a fair cross section of the community." *Test v. United States*, 420 U.S. 28, 30 (1975)(citing 28 U.S.C. § 1861).

Such purpose is, moreover, evident in the structure and context of the Act itself. The Act directs district courts to devise and implement written jury selection plans "designed to achieve" the policies set forth above. 28 U.S.C. § 1863(a). Section 1863(b) sets forth the basic requirements for each plan, which must be approved as compliant with the Act by the judicial council of the relevant circuit before implementation.[8] Subsection (b)(6), most at issue here, requires plans to:

> (6) specify that the following persons are barred from jury service on the ground that they are exempt: (A) members in active service in the Armed Forces of the United States; (B) members of the fire or police departments of any State, the District of Columbia, any territory or possession of the United States, or any subdivision of a State, the District of Columbia, or such territory or possession; (C) public officers in the executive, legislative, or judicial branches of the Government of the United States, or of any State, the District of Columbia, any territory or possession of the United States, or any subdivision of a State, the District of Columbia, or such territory or possession, who are actively engaged in the performance of official duties

"Public Officer" is elsewhere defined as anyone who is "either elected to public office or who is directly appointed by a person elected to public office." 28 U.S.C. § 1869(i).

As noted above, challenges to compliance with the Act are governed by section 1867, which provides both substantive and procedural requirements. Substantively, a movant may seek dismissal "on the ground of substantial failure to comply with [JSSA] provisions . . . in selecting the grand or petit jury." 28 U.S.C. § 1867(a). Motions must include "a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title." 27 U.S.C. § 1863(d). Upon that showing movants are entitled to a hearing and "shall be entitled the testimony of

---

[8] This court's plan became effective after approval by the Judicial Council of the First Circuit on November 1, 2015. *See* UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS PLAN FOR RANDOM SELECTION OF JURORS, available at http://www.mad.uscourts.gov/resources/pdf/RevisedJuryPlan.pdf (last accessed November 28, 2017).

the jury commission or clerk, if available, any relevant records and papers not public or otherwise available used by the jury commissioner or clerk, and any other relevant evidence." *Id.*

Here, the Defendants submitted affidavits that, in effect, argue that the ADA was exempt under 1863(b)(6) and that her inclusion on the grand jury constitutes a substantial failure to comply with the JSSA and therefore merits dismissal. Even assuming that the ADA is a "public official" as defined by the Act (which the government does not dispute), the court concludes there is no showing of substantial failure.

As numerous courts have recognized, "substantial failure" lacks any statutory definition and gains meaning from case law. *See, e.g., United States v. Candelaria-Silva*, 166 F.3d 19, 32 (1st Cir. 1999) ("Congress left the content of this term largely up to the courts.") (citing House Report, 1968 U.S.C.C.A.N. at 1794 ("Your committee would leave the definition of 'substantial' to the process of judicial decision")). The First Circuit, like all other courts, contrasts substantial failures with "technical violations." *United States v. Savides*, 787 F.2d 751, 754 (1st Cir. 1986). "A substantial failure is one that contravenes one of the two basic principles of the Act: (1) random selection of jurors, and (2) determination of juror disqualification, excuses, exemptions, and exclusions on the basis of objective criteria." *Id.*; *see also United States v. Ramirez*, 884 F.2d 1524, 1530 (1st Cir.1989) ("The test ... for a substantial violation is whether it 'either allowed discriminatory selection of jurors or otherwise prevented jury panels from consisting of fair cross sections of the community.'") (quoting *United States v. Bearden*, 659 F.2d 590, 602 (5th Cir. 1981)). Technical violations, on the other hand, "do not frustrate the random selection and cross section requirements and do not result in discrimination and arbitrariness." *Savides*, 787 F.2d at 754; *see also United States v. Miller*, 116 F.3d 641, 657 (2d Cir. 1997) ("In order to prevail on a JSSA challenge, a defendant must show a 'substantial failure' in proportional representation.")

Failure to exempt the ADA—a single juror—is not substantial because it does not threaten the broader principles of random selection and trial by a cross section of the community. In short, the error is technical and the argument myopic. To implicate the Act's principles, defendants must show some broader, more systemic failure that threatens the act of drawing jurors from a cross section of the community or involves categorical exclusion, not the isolated incident of wrongful inclusion at issue here. In other words, substantial violations are those that "frustrate the Act's goals of obtaining jury *lists* that are a cross-section of the community," *United States v. Erickson*, 75 F.3d 470, 477 (9th Cir. 1996) (emphasis added), not those that result in inclusion of a single exempted individual. *See United States v. Evans,* 526 F.2d 701, 705-06 (5th Cir. 1976) (describing inclusion of "fireman, policemen, and servicemen" exempted under 1863(b)(6) as "technical errors"). Defendants have therefore failed to assert facts amounting to a substantial failure to comply with the JSSA and the motions to dismiss must be denied.

It is, moreover, generally accepted practice to allow technically exempt individuals to not claim the exemption and, if otherwise qualified, serve on a jury. The "exemption" is a release from the obligation of service and, notwithstanding the statute's use of the term "barred," certain people with the listed occupations are not prohibited from service even though they are technically "barred" due to an exemption. *Cf. Beras v. United States*, No. 05 CIV. 2678 SAS, 2013 WL 2420748, at \*2 (S.D.N.Y. June 4, 2013) (holding exemptions "inure [solely] to the benefit of the exempted persons.")

To the extent the Defendants suggest the failure to exempt the ADA is substantial because of a perceived risk of bias, they are mistaken. As the First Circuit has explained in another context, "[t]here is no hint in the statutory history that the Jury Selection Act was intended to do more than provide improved judicial machinery . . . to ensure a representative cross section of the district or division in which the grand or petit jury sits." *United States v. Cates*, 485 F.2d 26, 27 (1st Cir. 1974).

9

Indeed, subsection 1863(b)(6) exempts several different occupational groups without respect to bias: members of fire and police departments, the military, and "public officials," which includes those directly appointed by elected officials in each the legislative, executive, and judicial branches of any state. These groups have been exempted from federal juries since 1948, twenty years before the JSSA, because congress deemed their undisrupted service "in the interest of the public health, safety, or welfare."[9] H. REPT. 308, at A156 (1947). There is no indication—statutory or otherwise—that consideration for bias is relevant to these exemptions. To the contrary, and as at least one court has noted, section 1863(b)(6) "represents Congress's recognition that the obligation of jury service imposed by Section 1861 is an obligation of public service, which the categories of persons enumerated in Section 1863(b)(6) are already actively discharging." *Beras*, 2013 WL 2420748 at *2. In brief, bias is irrelevant to the Rule 6(b)(2) inquiry.

### B. Other Uncited Authorities for Relief

As explained above, the Defendants have not established grounds for dismissal under Rule 6(b)(2). By voicing their arguments in terms of bias rather than "substantial failure," however, Defendants appear to cast a wide net for other authorities. To the extent they thereby invoke Federal Rule of Criminal Procedure 12(b)(3) or other authorities, the court finds the Defendants' arguments insufficient and premature and therefore denies without prejudice.

The entirety of Defendants' arguments involve an assertion of bias uncorroborated by evidence. Defendants argue that ADAs, like Assistant United States Attorneys, are biased as a matter of law. Krasin and Nathan Caballero go slightly further and assert through affidavits that they have open or past cases in the ADA's jurisdiction, emphasize the government has filed bills of

---

[9] Those exemptions where originally codified at 28 U.S.C. § 1862. The JSSA retained them at 1863(b)(6), and "narrowly define[d] the term 'public officer' so as to include only those persons whose government service is such that an interruption for jury service does not seem to be in furtherance of the public interest." S. REPORT 891, *Improved Judicial Machinery for the Selection of Federal Juries,* at 35 (1967).

information to establish prior convictions based on those cases, and speculate the ADA who served as grand jury foreperson may have been personally involved with or "aware of" their cases. (*See* Dkt. Nos. 132-33, 148 at 1-2, 153-1 at ¶¶ 7-9, 156-1). Beyond that, the Defendants state that model voir dire questions concerning impartiality and prior experience with the criminal justice system populate the FJC's District Court Judge bench book.[10] In this manner, and without reference or citation to legal authorities, the Defendants contend the ADA's "potential" or "probable" bias irretrievably tainted the indictments against them. (*See* Krasin Memo., Dkt. No. 149 at 2 (the "Grand Jury had a potential conflict of interest when [the ADA] serve[d] as a Grand Juror in the instant case, a prejudice which could not be cured."); Caballero Memo., Dkt No. 156-2 at 2 ("[I]t is probable that police witnesses will be viewed [by ADAs] as generally more credible than would a non-law enforcement witness . . . .").)

The ADA's service as the foreperson of a grand jury no doubt invites a critique based on an appearance of bias and risks concerns for implicit bias in favor of law enforcement witnesses—especially when considering that the ADA works in a jurisdiction in which some defendants' prior convictions occurred. Nevertheless, the movants are not entitled to dismissal under *any* authority because they have not established or even addressed prejudice. The Supreme Court has held that, as a "general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988); *see also United States v. Lopez-Matias*, 522 F.3d 150, 154 (1st Cir. 2008) ("'[T]he district court did not make a finding of prejudice, and that legal error is a *per se* abuse of discretion."); *United States v. Prochilo*, 10-CR-10335-RGS, 2012 WL 3067462, at *1 (D. Mass. July 30, 2012) ("Errors in a grand jury proceeding do not warrant dismissal absent a showing of prejudice."). Accordingly, "[w]here a

---

[10] However, there has been no request for this court to examine or order disclosure of the actual voir dire of the grand juror at issue.

11

defendant seeks dismissal of the indictment before there is a petit jury verdict, such relief 'is appropriate only if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Goodrich v. Hall*, 448 F.3d 45, 50 (1st Cir. 2006) (quoting *Nova Scotia* at 356).[11]

To the extent the Defendants attempt, by implication, to invoke a presumption of prejudice, they do so without support from legal authority. *See, e.g.*, *United States v. Le Pera*, 443 F.2d 810, 812 (9th Cir. 1971) ("Bias and prejudice will not be presumed from the fact that a juror is engaged in law enforcement work.") *Mikus v. United States*, 433 F.2d 719, 724 (2d Cir. 1970) ("The mere fact of membership on a police force is not presumptively a disqualification for service on a jury in a criminal trial."); *Estes v. United States*, 335 F.2d 609, 613 (5th Cir. 1964) ("There was no specific showing of bias and prejudice by appellant resulting from the widespread publicity, and the fact alone of such publicity did not in itself constitute a sufficient showing of bias and prejudice.")

This case involves various controlled purchases, intercepted communications, and contraband seized at 53 Samosett Street, and to establish prejudice Defendants must raise a "grave doubt" as to the grand jury's decision to indict. *Goodrich*, 448 F.3d at 50. It is impossible to assess how Defendants can meet that burden without consideration of grand jury materials, which no defendant has moved to disclose.[12] Such materials would be necessary to any prejudice analysis, as

---

[11] Challenges under the JSSA are an exception to the prejudice requirement. Drafters of the Act expressly eliminated the need "to prove prejudice as a condition of judicial intervention when substantial noncompliance with the act is established." H.R.Rep. No. 1076, 90th Cong., 1st Sess. 13.; *see also United States v. Green*, 389 F. Supp. 2d 29, 68 (D. Mass. 2005) (recognizing that "substantial failure" does not require prejudice); *United States v. Okiyama*, 521 F.2d 601 (9th Cir. 1975) (same). The Supreme Court has, of course, recognized other isolated exceptions to the prejudice requirement that have not been invoked and do not apply here. *See Vasquez v. Hillery*, 474 U.S. 254, 260-264 (1986) (holding that systematic racial discrimination in selection of grand jurors violated the Equal Protection Clause and required dismissal of indictment); *Ballard v. United States*, 329 U.S. 187, 193 (1946) (invoking supervisory power to dismiss indictment issued by grand jury from which women were "intentionally and systematically" excluded).

[12] Subsections (e)(3)(E)(i) and (e)(3)(E)(ii) of Rule 6 permit courts to authorize disclosure of grand jury matters upon a showing of "particularized need" that outweighs the traditional interest in grand jury secrecy. *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400 (1959); *see also Wright & Miller*, 1 Fed. Prac. & Proc. Crim. § 108 (4th ed.). The court is unaware of motions for disclosure thereunder or other efforts to make a showing of particularized need here.

would the voir dire of the ADA for establishing his or her alleged bias. In any event, the speculation on which the present bias-based arguments rest is plainly insufficient.

## IV. CONCLUSION

Accordingly, the Defendants' motions to dismiss are hereby DENIED. (Dkt. Nos. 147, 148, 150, 156). To the extent the Defendants move under Rule 12 or implicitly invoke other grounds for dismissal relating to the ADA's alleged bias, their motion is denied without prejudice. Additionally, Defendant Carrasquillo's motion to suppress is likewise DENIED for lack of standing. (Dkt. No. 146).

It is So Ordered.

　　　　　　　　　　　　　　　　　　　　　　　/s/ Mark G. Mastroianni　　　　　　
　　　　　　　　　　　　　　　　　　　　　　　MARK G. MASTROIANNI
　　　　　　　　　　　　　　　　　　　　　　　United States District Judg