UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHRISTOPHER CABALLERO, et al.,<br><br>Defendants. | No. 16-cr-30034-MGM |

MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTIONS TO SUPPRESS
(Dkt. Nos. 151, 157, 158, 159, 238, 239, 240)

October 24, 2018

MASTROIANNI, U.S.D.J.

On July 25, 2016, as the result of a multi-agency investigation, federal agents seized 15,294 bags of heroin, 28.5 grams of cocaine, a small amount of marijuana, firearms, ammunition, and over $23,000 in cash from the residence located at 53 Samosett Street, Holyoke, MA ("the house") and an Infiniti sedan parked in front of the house. Defendants were subsequently indicted and charged with various drug- and firearm-related offenses, including conspiracy, distribution, possession, aiding and abetting, and felon in possession. *See* Dkt. No. 116.

Before the court are motions to suppress filed by Defendants Christopher Caballero (Dkt. No. 151), Sean Krasin (Dkt. No. 157), and Nathan Caballero (Dkt. No. 159).[1] Krasin also sought to join Christopher Caballero's[2] motion to suppress (Dkt. No. 158). An evidentiary hearing took place over four days: February 15, March 27, June 5, and June 22, 2018. On August 7, 2018, the

---

[1] The court previously denied Defendant Raymond Carrasquillo's motion to suppress (Dkt. No. 146) for lack of standing. *See* Dkt. No. 185.

[2] Defendants are referred to by their last names, except for Christopher and Nathan Caballero, who are brothers and who are referred to by their first names.

government, the Caballero brothers, and Krasin submitted supplemental briefing based on the evidentiary hearing. *See* Dkt. Nos. 238, 239, & 240.

For the reasons set forth below, the court denies the motions to suppress. All of the evidence recovered from the house and the Infiniti is admissible. Krasin's motion to join Christopher Caballero's motion to suppress is denied as moot.[3]

## I. FINDINGS OF FACT

The court bases its findings on the evidence introduced at the evidentiary hearing. Five witnesses testified at the hearing: FBI Special Agent Douglas Bessette; FBI Special Agent Mark Karangekis; Holyoke Police Department Detective Jared Hamel; Michael Garneau, an expert in forensic analysis of video, audio, and digital images; and Alyssa Caballero, the Caballero brothers' sister who lived with them at 53 Samosett Street. Agents Bessette and Karangekis and Detective Hamel were credible: their respective testimony was mutually corroborating, and text messages, phone calls, and video footage corroborated all of their testimony.

Mr. Garneau was credible, but his testimony was ultimately unpersuasive. He testified that pole camera[4] footage apparently showed flashes of light that he believes came from a camera or cell phone, inside the house, and showed patterns of light that he believes are consistent with a flashlight. He also testified the video footage showed officers entering the house with paper bags and flashlights. Defendants' conclusion that Mr. Garneau's testimony establishes that the police unlawfully searched the house before the warrant issued is speculative. Mr. Garneau's testimony does not persuade the court that police searched the house between conducting a protective sweep

---

[3] Without deciding his claim of standing, Krasin's assertion of standing relies heavily on the testimony of Alyssa Caballero, which—as described below—the court has found to lack credibility.

[4] A pole camera allows law enforcement officers to watch video surveillance in real time.

2

and the time the warrant issued, or that police acted unreasonably. The court's assessment of Mr. Garneau's testimony is discussed more fully in section II.C below.

Ms. Caballero's testimony was not credible based upon the court's observing her testimony and considering its substance. While she appeared generally responsible and was articulate, her testimony regarding the events of July 25, 2016, her knowledge and beliefs concerning her brothers' livelihood, and the role that livelihood played in the house is not credited. As the evidence amply demonstrated, contraband and various indicia of drug distribution lined the house. The breadth of this evidence overwhelms her claim that she had no knowledge of her brothers' drug sales. For example, a photograph of the kitchen shows a drug scale in the open on the counter. But Ms. Caballero—who was eating dinner with her children in the kitchen when law enforcement agents entered—claimed she had "never seen [the scale] before." Likewise, there was a safe in the basement near where she did laundry "at least every other day," but she testified she did not know the safe was there. There was also a bottle of caffeine powder (which is commonly used to dilute heroin) on top of the washing machine, but Ms. Caballero testified she had never seen it. That assertion too is not believable given how frequently she was in the basement doing laundry. Similarly, her testimony that she did not know who owned the Infiniti—which was owned by one of her brothers and which, according to Agent Karangekis, was parked outside of the house for "a great deal" of the weeks'-long investigation—is incredible.

Based on the credible testimony and other evidence presented at the evidentiary hearing, the court makes the following factual findings.

### A. GTF Investigation

In early 2016, the Western Massachusetts Gang Task Force ("GTF")[5] investigated heroin distribution by La Familia, a local street gang in the Holyoke and Springfield areas. As part of that investigation, the GTF cultivated cooperating witnesses ("CWs") who purchased heroin multiple times from both Caballero brothers, Krasin, and Defendant Luis Roman-Soler during the spring of 2016. Several of the purchases from the Caballero brothers were made at their home, located at 53 Samosett Street.

The GTF hoped to identify and pursue the Defendants' bulk supplier. To do so, the GTF obtained Title III warrants for electronic surveillance of several cell phones, conducted phone surveillance (of both calls and text messages), and installed a pole camera outside 53 Samosett Street. Through those means, agents determined that retail-level heroin sales took place at the house on a near daily basis. Based on this evidence, Agent Bessette testified he believed there was probable cause to apply for a warrant to search the house, but the GTF did not apply for one because it still had not identified the heroin supplier.

### B. Events of July 25, 2016

On July 25, 2016—through a series of intercepted cell phone calls and text messages—the GTF learned the identity of the person believed to be the supplier: Defendant Carrasquillo. Late that afternoon, Christopher Caballero began exchanging calls and texts with a number not being surveilled and that ended up belonging to Carrasquillo. At approximately 4:38 p.m., Christopher called Carrasquillo asking to purchase a "100 pack" of heroin, which is comprised of approximately 10,000 end-user bundles, for $22,000. Carrasquillo did not know Christopher Caballero by voice or name until Christopher identified himself as Nathan Caballero's brother, whom Christopher

---

[5] The GTF is a multi-agency unit comprised of federal and state law enforcement personnel that investigates gangs, including drug and gun-related crimes.

described as the person "who buys all your material." As Agent Bessette testified, law enforcement had not previously surveilled communications with Carrasquillo and inferred from this conversation that "this was the load [they] were looking for."

At 5:13 p.m., during a second phone call, Christopher told Carrasquillo that he was at the mall. They discussed price, and Christopher ended the call stating he needed time to determine the exact amount he would purchase (either 90 or 100 packs). Agent Bessette testified that at this point, he did not know where the deal would happen because Christopher said he was at the mall, and he and Carrasquillo did not discuss where to meet.

Agent Bessette called the federal prosecutor on the case at around 5:30 p.m. to discuss the documents needed for a search warrant application. At this point, he did not yet know where Christopher and Carrasquillo would meet, but Agent Bessette testified he began the process of preparing a search warrant affidavit and related warrant application documents.

At approximately 6:09 p.m., Carrasquillo called Christopher, and they discussed where to meet to conduct the drug sale. Christopher said to meet at "my crib"—which the GTF believed meant 53 Samosett Street—"in 20 minutes." Over 20 minutes later, that meeting had not occurred. At approximately 6:35 p.m., Christopher texted Carrasquillo with questions about the brand of the heroin and concerns about quality and purity. Christopher indicated he was still determining the exact quantity he would purchase. Carrasquillo responded the heroin he had available had a different stamp on it than heroin he had sold before, but he assured Christopher that despite the different stamp, the heroin was the same as what he had previously sold.

During this text message exchange, Agent Bessette met with the prosecutor, and together they contacted the magistrate judge about the warrant application. The magistrate judge instructed them to meet her at the State Police barracks in Northampton, MA.

5

At 7:08 p.m., Christopher texted Carrasquillo, saying he wanted 100 packs of heroin. Carrasquillo responded, "K" and then, "On my way." One minute later, though, Carrasquillo asked Christopher to instead meet at the mall. Agent Bessette testified that at this point, he did not know where the sale would take place.

Christopher promptly responded, asking for a reduced price. He did not respond to Carrasquillo's request to meet at the mall, nor did he mention where the transaction would occur. Roughly a half hour later, at 7:42 p.m., the two spoke over the phone, negotiated a final price and quantity, and agreed to meet at 53 Samosett Street. Agent Bessette testified that this 7:42 call "definitively," and for the first time, "established" the meeting place as 53 Samosett Street.

At approximately 8:00 p.m., agents observed a BMW SUV arrive at the house. Carrasquillo got out of the front passenger door (the driver remained in the vehicle), got a black backpack out of the backseat, and entered the house with the backpack. Agents Bessette and Karangekis testified that 100 packs of heroin would have fit in the backpack.

### C. Initial Entry into the House

On Agent Karangekis' orders, eight to ten agents entered the house through the front door roughly two to three minutes after Carrasquillo did. Other agents and law enforcement officers were stationed around the house. Agent Karangekis testified: "We had officers approach the BMW. We had officers cover the front street, and we had officers cover the rear." Detective Hamel confirmed there were officers securing the back of the house, and there were officers "securing Samosett Street on either side of the building."

The GTF intended to secure the premises pending issuance of the warrant. Agent Karangekis testified: "I made a decision to make entry and secure the location so as to make sure no contraband was removed or destroyed and that we could secure individuals within [the] inside."

Agent Bessette concurred: "We believed that the hundred packs of heroin were going to be coming to the house and we wanted to essentially freeze the scene and get a search warrant."

Agents found the front door ajar and pushed it open. Immediately inside the house, agents discovered Christopher Caballero and Carrasquillo on a couch in the living room. Blocks of what appeared to be packaged heroin and a partially opened backpack with a "large amount of cash" in it were also on the couch. Carrasquillo's hand was on or under the backpack, and after he failed to heed an order to move his hand, he was taken to the ground by an officer. Both Christopher and Carrasquillo were handcuffed and pat-frisked for weapons. Officers also patted the couch and the backpack to check for weapons but left in place the money in the backpack. Other officers subdued Nathan Caballero in his bedroom in the back of the first floor; they handcuffed him and pat-frisked him for weapons.

Agents also performed a protective sweep of the house, from the basement to the second floor, searching in the many areas that may hide a person's body. The sweep lasted approximately five to ten minutes.

The Caballero brothers and Carrasquillo were all brought to the kitchen. Agents ordered Alyssa Caballero, who had been in the kitchen feeding three minor children, to remain there with the children. Agent Karangekis told the Caballero brothers and Carrasquillo that they "were securing the residence so that [they] could apply for a search warrant and if granted a search warrant, search the house." He told them that he did not want to ask them any questions, and he orally gave them *Miranda* warnings. Agent Karangekis testified that he did not ask questions of any of the three men, he has no knowledge that any law enforcement agent asked them any questions, and he has no knowledge of any of them making any statements that night.

Agents and officers remained in the residence while tending to administrative matters and pragmatic concerns, including placing Carrasquillo and the Caballero brothers under arrest,

performing searches incident to those arrests, and removing them from the premises; identifying the minor children and arranging for them to be picked up by a relative; and assigning further roles to GTF members pending issuance of the warrant.

Before Nathan Caballero was transported for booking, a search of his person located a key to the Infiniti in his pocket. The Infiniti was parked in the front yard of the house, within a surrounding fence. It did not have a license plate.

After Defendants were taken to the Holyoke Police Department for booking, roughly two or three officers stayed inside the house on a rotating basis to safeguard potential evidence. Most of the officers left the area entirely; those who remained were mostly GTF agents and a few Hampden County narcotics task force officers. They ordered pizza and soda and ate in shifts down the street from the house while they awaited a search warrant.

### D.    Search Warrant

From roughly 6:00 p.m. to between 9:00 and 9:30 p.m., Agent Bessette was working on the search warrant application. He continued to draft the affidavit, which was over 90 pages long. Portions of it were copied and pasted from other documents, including the Title III applications. The affidavit included descriptions of the CWs' controlled purchases; pole camera footage; summaries of surveilled communications, including those between Christopher Caballero and Carrasquillo described above; and that approximately 100 packs of suspected heroin had been observed in plain view. On several occasions, Agent Bessette stopped working on the affidavit because he got phone calls and text messages updating him about what was happening at the house. He also stopped working to watch a live feed from the pole camera showing Carrasquillo arrive at the house.

Agent Bessette included one clause in the affidavit related to evidence seen in plain view in the house: "Upon the UM [(meaning Carrasquillo)] entering 53 Samosett Street, members of the

8

WMGTF secured the residence and in plain view saw approximately 100 packs of suspected heroin." He finished drafting the warrant application "sometime after 9 p.m.," at which point, he drove with the prosecutor to meet the magistrate judge at the barracks in Northampton. They met with the magistrate judge at approximately 10:00 p.m. The magistrate judge reviewed the application and signed the warrant at approximately 10:30 p.m.

### E. Search Pursuant to the Warrant

At around 10:30 p.m., Agent Bessette called Agent Karangekis and told him the magistrate had signed the warrant and agents could begin searching. Agent Karangekis then assigned officers various roles for the search. Pursuant to Agent Karangekis' directions, Detective Hamel began taking "entry photographs" to document what the house looked like before the search began.[6] He then took photographs throughout the search and exit photographs after the search was completed.

The search of the house uncovered a variety of contraband (beyond the heroin initially seen in plain view), including more bags of heroin, cocaine, marijuana, United States currency, ammunition, and drug paraphernalia, all of which was later detailed in Agent Karangekis' FD-302 report.

After obtaining the warrant, agents also searched the Infiniti. In the Infiniti, agents found bags of heroin, firearms, ammunition, magazines containing live rounds of ammunition, and drug paraphernalia. This evidence is also detailed in Agent Karangekis' FD-302 report.

---

[6] The government entered an exhibit into evidence listing metadata associated with the photographs' JPG files. The metadata indicates that the first photograph was taken at 9:37 p.m. on July 25. Detective Hamel testified that he is certain he began taking photographs "shortly after 10:30" and that the time stamp is an hour off because the camera does not adjust to accommodate daylight saving.

Defendants did not timely object to the government's exhibit listing the metadata. Defendants later marked for identification an exhibit that also listed the photographs' metadata, but the time stamps on this list began at 8:37 p.m. Defense counsel represented that the list was a screen shot taken by a copy vendor. Defendants asked Detective Hamel a number of questions about this list on cross-examination. But because he had not printed it, Defendants were unable to lay a proper foundation, and the exhibit was not admitted.

## II.     CONCLUSIONS OF LAW

The initial entry, protective sweep, and freezing of the house constituted a search before any warrant issued, as the parties have acknowledged. Defendants argue that the evidence recovered from the house must be suppressed because agents and police officers unlawfully searched the house between their initial entry and when the search warrant issued. Defendants claim that the agents and officers acted egregiously in purportedly conducting those unlawful searches and in failing to obtain an anticipatory warrant. Defendants also argue there were no exigent circumstances and that discovery of the evidence in the house was not inevitable. The government, on the other hand, contends that certain evidence was lawfully found during searches incident to the Defendants' arrests, that all of the evidence seized is admissible under the independent source doctrine, and that there was an exigency justifying the warrantless entry.

The court begins with the government's exigency argument. As explained below, the government has not met its burden of establishing that an exigency existed justifying the initial entry into the house. Regardless, all of the evidence recovered from the house is admissible under the independent source doctrine.[7]

---

[7] Defendants do not challenge the search of the Infiniti. The court notes that it appears only Nathan Caballero would have standing to challenge that search. Regardless, the search was conducted pursuant to the warrant, and the evidence seized from the Infiniti—which was parked inside a fence within the curtilage of the house—was within the scope of the warrant. As a result, all of the evidence seized from the Infiniti is admissible.

It is well established that vehicles found within the curtilage of a dwelling are within the scope of a warrant particularly describing the dwelling so long as the vehicles could contain the items sought and described in the warrant. *See United States v. Asselin*, 775 F.2d 445, 446-47 (1st Cir. 1985) (car parked adjacent to defendant's trailer's carport and birdhouse hanging 15 feet from trailer were either within curtilage or in an open field; either way, warrantless search of car was lawful); *United States v. Ferreras*, 192 F.3d 5, 10-11 (1st Cir.1999) (warrant authorizing search of a premises permits search of appurtenant areas); *see also* Wayne R. Lafave, Search & Seizure: A Treatise on the Fourth Amendment § 4.10(c) (5th ed.) ("[A] description in a warrant of a dwelling at a certain place is taken to include the area within the curtilage of that dwelling, so that it would cover a vehicle parked in the driveway rather than the garage.").

Here, the warrant application sought authorization to search "[t]he residence at 53 Samosett Street" and particularly described that residence as "within a structure described as a duplex." Dkt. No. 4 at 2. The application also included a picture of the residence, depicting the entirety of the duplex and the gated yard that encompassed the driveway. *See id.* Given the photographs, video, and testimony introduced at the hearing, the court concludes that the Infiniti was within the curtilage of 53 Samosett Street (surrounded by a chain link fence and found five to ten feet from the porch). By

## A. The government has not established the existence of an exigency.

A warrantless search of a home is "presumptively unreasonable" because "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585-86 (1980) (internal quotations and citation omitted). "The special solicitude shown for the individual residence is reflected by the limited set of truly exigent circumstances which will permit an exception to the warrant requirement." *United States v. Hidalgo*, 747 F. Supp. 818, 828 (D. Mass. 1990). Accordingly, "[o]n a motion to suppress evidence seized on the basis of a warrantless search, the presumption favors the defendant, and it is the government's burden to demonstrate the legitimacy of the search." *United States v. Delgado-Pérez*, 867 F.3d 244, 250 (1st Cir. 2017) (internal quotations and citation omitted).

The government argues that the initial, 8:00 p.m. entry into the house was lawful due to exigent circumstances. To show that exigent circumstances existed, the police must have reasonably believed that "there [wa]s such a compelling necessity for immediate action as w[ould] not brook the delay of obtaining a warrant." *Fletcher v. Town of Clinton,* 196 F.3d 41, 49 (1st Cir. 1999) (internal quotations and citation omitted). "Proof of exigent circumstances should be supported by particularized, case-specific facts, not simply generalized suppositions about the behavior of a particular class of criminal suspects." *United States v. Samboy*, 433 F.3d 154, 158 (1st Cir. 2005) (internal quotations and citation omitted). The Supreme Court has described this as a "heavy burden." *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984). Exigent circumstances are present, though, "when delay would risk the destruction of evidence." *Samboy*, 433 F.3d at 158. When invoking that theory, the government must show that officers had "an objectively reasonable basis for concluding that the loss or destruction of evidence [was] likely to occur." *Id.*

---

particularly describing the residence and including a picture of the gated area where the Infiniti was parked, the government received authorization to search containers, including cars, within that curtilage.

Here, the government has not met its burden to show exigent circumstances justified the initial entry. The government cites page 85 of the hearing transcript from February 15, 2018 (Dkt. No. 199) and pages 28-37 of the hearing transcript from the afternoon of March 27, 2018 (Dkt. No. 206) to support its argument there was an exigency. During the February 15th hearing, Agent Bessette simply testified that the agents "believed that the hundred packs of heroin were going to be coming to the house and [agents] wanted to essentially freeze the scene and get a search warrant." Agent Bessette did not elaborate or give any reason why they wanted to freeze the scene.

Similarly, on pages 28-37 of the March 27th hearing transcript, Agent Karangekis summarily testified that he "made a decision to make entry and secure the location to make sure no contraband was removed or destroyed and that we could secure individuals . . . inside." He also explained that he instructed officers to perform a protective sweep of the house, including the basement and second floor, to "make sure no one was in a position to either hurt us or go undiscovered thereby leaving them in a position to destroy potential evidence." He told the officers that that they "were going to secure the location" because he "wanted everything frozen."

Later (on pages the government does not cite), when asked why he decided to freeze the location to secure evidence, Agent Karangekis merely speculated that people inside "could have" destroyed evidence or left without detection. Specifically, he testified that a suspect "could have come out; evidence could have been moved or destroyed; [a suspect] could have gone out the back door *had no one been watching it*" (emphasis added). But when asked if there were "other officers stationed around 53 Samosett Street," Agent Karangekis conceded, "[w]e had officers cover the front street, and we had officers cover the rear." Detective Hamel also testified that officers secured the back of the house, and there were officers on either side of the house. When asked again about his belief that exigent circumstances existed, Agent Karangekis cited "the entirety of our investigation, the surveillances, the controlled drug purchases, the physical surveillance, electronic

12

surveillance, the intercepts that day, our physical surveillance that day" as the "bas[e]s" for his "concern" that evidence "could be removed [or] relocated." He stated that he "determin[ed] . . . there was an exigent circumstance to be able to secure that location, freeze the situation, and present the information that [they] had to the court."

The testimony, even taken as a whole, is conclusory and insufficient. It articulates no particular, case-specific facts supporting Agent Karangekis' belief that some exigency existed. No testimony was offered describing specifically the size, consistency, or makeup of the drugs that could have subjected them to destruction. Nor was there testimony about the means of destruction feared or how it would be quickly accomplished. And there was no reference to any agent's experience or training applicable to the drugs or the circumstances of this case.[8] Instead, the testimony simply lists *sources of evidence*—not facts—establishing probable cause for the commission of the underlying crimes. "Probable cause is a necessary, but not a sufficient, precondition for invoking the exigent circumstances doctrine." *United States v. Almonte-Báez*, 857 F.3d 27, 31 (1st Cir. 2017). Other than speculation that evidence "could be moved or destroyed" and individuals "could have" left, the factual bases of Agent Karangekis' belief were never addressed. And his apparent concern that someone could leave undetected is belied by his testimony and Detective Hamel's testimony that officers were stationed at the back of the house. The government therefore has not met its burden, and the court must conclude that the initial entry was unlawful.

This conclusion results from the weight of burden rather than the weight of evidence. The government surely could have established facts grounding a reasonable belief that delay would result in loss of evidence, but it did not. For example, Agent Karangekis would have been justified in believing that securing the premises from the outside or arresting Carrasquillo on his way out of the

---

[8] If, for example, the drugs could have been easily flushed down a toilet, that is a fact for the government to establish in a case-specific way and not for the court to fill based on information heard from other cases.

13

house would have alerted those within to police presence and caused the destruction of evidence. *See United States v. Edwards,* 602 F.2d 458 (1st Cir. 1979) ("[T]he possibility that evidence will be destroyed by defendants *who have discovered government surveillance of their activities* often has been recognized as a sufficient exigency to justify warrantless entry.") (emphasis added); *see also United States v. Smalls*, 617 F. Supp. 2d 1240, 1257 (S.D. Fla. 2008) (holding exigent circumstances existed after defendant answered knock at his door, exposing contraband to plain view).

> In narcotics cases in particular, the First Circuit and other courts have consistently found exigent circumstances to exist where there is *specific evidence* that a supplier of drugs has either detected police surveillance, or is acting nervously, or is expecting his confederate to return at a particular time and would therefore likely flee or dispose of the evidence if his arrested confederate did not return promptly.

*Hidalgo*, 747 F. Supp. at 826 (emphasis added). But neither Agent Karangekis nor any other law enforcement officer articulated any such particularized facts. *Contra United States v. Moore*, 790 F.2d 13, 16 (1st Cir. 1986) (arrested dealer told police that supplier was apprehensive and was expecting dealer to return promptly with money); *Edwards*, 602 F.2d at 468 (defendant pointed toward FBI agent at surveillance post before entering house; defendant had been previously acquainted with agent, and agent feared defendant had recognized him); *accord United States v. Socey*, 846 F.2d 1439, 1447 (D.C. Cir. 1988) (commotion on street in "quiet, residential neighborhood" due to arrest may have alerted coconspirators in house), *abrogated on other grounds by Kentucky v. King*, 563 U.S. 452 (2011). Instead, the government has only listed potential evidentiary sources from which such facts may be inferred. This is not enough.

  **B.**   **The Evidence Seized from the House is Nevertheless Admissible Under the Independent Source Doctrine.**

"The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search." *Murray v. United States*, 487 U.S. 533, 536 (1988). The "independent source" doctrine provides an "exception" through which "evidence acquired by an untainted search

which is identical to . . . evidence unlawfully acquired is admissible." *United States v. Dent*, 867 F.3d 37, 40 (1st Cir. 2017) (internal quotations and citation omitted). "Accordingly, '[w]hether the initial entry [into a home] was illegal or not is irrelevant to the admissibility of the challenged evidence' where 'there was an independent source for the warrant under which that evidence was seized.'" *Id.* (quoting *Segura v. United States*, 468 U.S. 796, 813-14, (1984)). "In determining whether evidence discovered in a lawful search pursuant to a warrant may be admissible in the aftermath of an unlawful entry," this court must consider:

> (1) whether the search warrant affidavit contained sufficient information to support probable cause without any information gleaned from the unlawful search; and (2) whether the decision to seek the warrant was in fact "independent of the illegal entry," i.e., "whether it would have been sought even if what actually happened had not occurred."

*United States v. Jadlowe*, 628 F.3d 1, 9 (1st Cir. 2010) (quoting *United States v. Dessesaure*, 429 F.3d 359, 369 (1st Cir. 2005)).

Here, there is no doubt that both prongs must be answered in the affirmative. First, as Defendants conceded, the affidavit contained information far exceeding probable cause without mention of the heroin found in plain view on the couch (this was the only post-entry evidence included in the affidavit). Only the last eleven words of the warrant affidavit related to the heroin was found in plain view on the couch: "and in plain view saw approximately 100 packs of suspected heroin." Even if those words were excised or redacted from the affidavit, there still would be sufficient probable cause to provide an independent basis for the issuance of the warrant. *See United States v. Veillette*, 778 F.2d 899, 903-04 (1st Cir. 1985) ("[T]he bales of marihuana that were improperly included in the warrant affidavit here should be . . . set to one side . . . and the remaining content of the affidavit examined to determine whether there was probable cause to search, apart from the tainted averments.").

Second, Agent Bessette began preparing the warrant application hours before agents initially entered the residence. Thus, GTF agents decided to apply for a warrant before they knew about—and, therefore, independently from—the evidence that they found in plain view.

Accordingly, all evidence recovered in the house is admissible under the independent source doctrine.[9]

### C. Defendants' Arguments for Exclusion Are Unpersuasive.

Defendants' primary argument rests on an egregious conduct theory. They, in essence, argue that law enforcement officers acted egregiously in performing unconstitutional searches after securing the residence but before the warrant issued, and that the GTF should have obtained an anticipatory warrant. These arguments are unpersuasive.

First, the court does not find that the agents performed unconstitutional searches between the initial entry at 8:00 p.m. and when the warrant issued at 10:30 p.m. Defendants rely on two witnesses to establish that unlawful searches happened during this period: Alyssa Caballero and expert Michael Garneau.

Ms. Caballero lacked credibility, as noted earlier. Her testimony that agents had moved "all around the house" establishes, at most, general commotion consistent with protective sweeps and securing the scene which, as photographs established, provided many places in which a person could have secreted. Her testimony regarding hearing "sounds" of searching on the second floor requires multiple inferences to conclude that unconstitutional searches took place. Her testimony on this point lacked detail, and she did not testify to having heard officers saying anything or talking to each

---

[9] The inevitable discovery doctrine is related to the independent source doctrine but does not apply here. The inevitable discovery doctrine is "an extrapolation from the independent source doctrine: *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." *Murray*, 487 U.S. at 539 (emphasis in original). The inevitable discovery doctrine applies to evidence that was not lawfully obtained but that the police inevitably would have discovered. Here, though, the evidence was lawfully obtained through a warrant based on untainted evidence from sources independent from the initial entry and protective sweep.

16

other consistent with them searching, and she did not observe them searching.[10] Even if her testimony were credible, her assertion that she heard sounds that may have been searching is not sufficient.

As for Mr. Garneau, he testified he synchronized still digital photographs with video footage from the pole camera and triangulated where certain individuals were at certain times. He assigned the agents and officers numbers to track their movements. He identified the agent taking the photographs (Detective Hamel) because Hamel's reflection appeared in a photograph of the bathroom mirror. Mr. Garneau also identified two agents carrying flashlights. There are portions of video footage in which Mr. Garneau could not identify the individuals because the sun was setting, and the lighting conditions were poor.

Mr. Garneau created a second-by-second timeline of various individuals' movements based on the video footage. At the hearing, he testified about this timeline and focused on several still frames from between 8:21:52 p.m. and 8:22:01 p.m.—a period of time during which, according to Mr. Garneau's analysis of the video footage, Detective Hamel was inside the house—in which Mr. Garneau claims to have identified light patterns reflecting on one window of the house. Some frames each show a small white dot that "appears quickly and stays in the same position." Mr. Garneau saw these dots "as flashes potentially from say a camera flash because of their specific position and the short period that they were visible." He explained: "[B]ecause of the duration of this little white dot and the change in position and the fact that it appears suddenly and then disappears, appears again it seems more consistent with a flash type light source"—meaning "[i]t could be from a cell phone or a camera"—"as opposed to a steady light source that would be coming from a flashlight." Other frames show "a funnel of a light beam that's reflecting off the

---

[10] She testified that she heard sounds "like drawers opening and closing. I didn't see it but I can hear things. They were like slamming things. It's like they were searching in there. I did hear sounds."

17

window." Mr. Garneau testified that in the video, "you can actually see that pattern of light moving across the window." According to Mr. Garneau, these frames have a "broader pattern of . . . what appears to be moving light source in the window" that "appeared more consistent with a flashlight source behind the window."

But Mr. Garneau acknowledged he could not be sure what the sources of the lights were, and it was "possible" that the light was from a car on the street. He also noted there were "curtains blocking that window"; photographs from inside the house confirm that two panel curtains (which were almost all the way closed) and a valance hung on that window. He testified, "I think it's possible" a light source inside the room could go through the curtain and be viewed on the pole camera outside, but he did not know the consistency or weight of the curtains. In addition, in some still frames, white spots of light appear over the exterior mullion separating the window's sashes. When asked on cross-examination whether those spots were coming from the glass (as opposed to the wood or vinyl mullion), Mr. Garneau replied, "I can't answer that because I don't know if there's another piece of glass, say a storm window, covering that double-hung window." Later, on redirect, he explained that the dots on the mullion could be due to "bleed[ing]" among the pixels when the video file was compressed, which means that the image might "not necessarily be[] 100% accurate." In short, Mr. Garneau could not say why white spots appear on the mullion in some stills.

At most, Mr. Garneau's testimony and report establish that a few brief patterns of light occurred during a several-second period shortly before 8:30 p.m. That these patterns were "consistent" with or "appeared to be" from a camera or a flashlight is no basis to conclude police searched the house for evidence before a warrant issued. As a result, although Mr. Garneau was credible and experienced in the fields of photography and moving media, the court cannot conclude on the basis of his testimony that agents conducted any unlawful search between their initial entry and when the warrant issued.

18

Second, that the government did not secure an anticipatory warrant does not preclude the applicability of the independent source doctrine. The court has already found that Agent Bessette began preparing his affidavit at approximately 5:30 p.m., more than thirty minutes before surveillance first suggested that drugs might be delivered to 53 Samosett Street and more than two hours before Christopher Caballero and Carrasquillo settled on that location. Agent Bessette perhaps could have prepared the warrant application more quickly, but no delay resulted from bad faith. And some portion of the delay in obtaining the warrant was due to travel and logistics involved with meeting the magistrate in Northampton.

Moreover, the police were under no obligation to apply for an anticipatory warrant simply because they had probable cause to arrest Defendants at an earlier time. In a different context, the Supreme Court has explained that "[l]aw enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause." *Hoffa v. United States*, 385 U.S. 293, 310 (1966). Likewise, "[f]aulting the police for failing to apply for a search warrant at the earliest possible time after obtaining probable cause imposes a duty that is nowhere to be found in the Constitution." *Kentucky v. King*, 563 U.S. 452, 467 (2011).

In sum, the court does not find any egregious conduct. Therefore, contrary to the cases on which Defendants rely, the principles underlying the exclusionary rule are not implicated in a manner that would preclude the applicability of the independent source doctrine.

**D.    Krasin's *Miranda* Argument Is Unsupported.**

In his motion to suppress (Dkt. No. 157), Krasin claimed that his 5th, 6th, and 14th Amendment rights were violated.[11] His argument was based on conclusory assertions that he was

---

[11] Christopher Caballero also raised a *Miranda* argument in his motion to suppress. At the close of the evidentiary hearing, his counsel acknowledged that argument had not been developed and withdrew it.

19

not properly advised of his *Miranda* rights; he did not make a knowing, intelligent, or voluntary waiver; he made involuntary statements after he invoked his right to counsel but interrogation continued; he did not know or understand the charges against him at the time he made the statements; and his rights to prompt arraignment and/or to be presented to a magistrate under Federal Rule of Criminal Procedure 5 were violated.

Krasin's motion does not specify or even hint at the content of his purported statements or the circumstances under which they were made. Indeed, there is no evidence that he made any statements. He submitted an unsigned affidavit with his motion. The unsigned affidavit appears aimed at establishing standing and does not mention any fact related to his *Miranda* argument. The court rejects Krasin's *Miranda* argument in its entirety because he has not put forth any supporting evidence.

### III. CONCLUSION

For the reasons set forth above, Defendants' motions to suppress (Dkt. Nos. 151, 157, & 159) are DENIED. All of the evidence seized from 53 Samosett Street and from the Infiniti is admissible. Krasin's motion to join (Dkt. No. 158) Christopher Caballero's motion to suppress is DENIED as moot.

It is So Ordered.

    /s/ Mark G. Mastroianni    
MARK G. MASTROIANNI
United States District Judge